UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEVEN BUNYAN,

     Plaintiff,

v.                                 Case No: 8:18-cv-2210-T-36JSS

UNITED STATES OF AMERICA,
ROBERT L. WILKIE, SECRETARY
OF THE DEPARTMENT OF VETERANS
AFFAIRS,

     Defendants.
_____/

**O R D E R**

     This cause is before the Court on Plaintiff's Renewed Challenge to the United States of America's Certification and Substitution for Dr. Azneer (the "Renewed Challenge"), (Doc. 45), which Defendants oppose, (Doc. 47), and Defendants' Motion to Dismiss and Incorporated Memorandum of Law (the "Motion to Dismiss"), (Doc. 40), which Plaintiff opposes, (Doc. 43). The Court, having considered the parties' submissions and being fully advised in the premises, will deny the Renewed Challenge and grant-in-part and deny-in-part the Motion to Dismiss.

**I.  BACKGROUND**

     **A. Factual Background[1]**

     Steven Bunyan ("Plaintiff"), an employee of the Department of Veterans Affairs (the "Department") at the time, provided temporary relief for a patient sitter in a hospital room at the

---

[1] As Rule 12(b)(6) serves as one of Defendants' bases for dismissal in the Motion to Dismiss, for purposes of this section, the facts are derived from the operative complaint, the allegations of which the Court must accept as true in considering a Rule 12(b)(6) motion. *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983). Further factual development through evidence is reviewed in another section below.

Bay Pines V.A. Medical Center on February 7, 2016. (Doc. 39 ¶¶1, 19). On that particular day, the hospital housed a patient in the room. *Id.* at ¶20. While in the room, Plaintiff observed the patient hide underneath his bed sheet and refuse to acknowledge Dr. Ira Azneer ("Dr. Azneer")—also an employee of the Department—when Dr. Azneer attempted to interact with the patient. *Id.* at ¶¶4, 20. Dr. Azneer abruptly departed from the room, angrily exclaiming, "I don't have time for this shit." *Id.* Following Dr. Azneer's departure, the patient became agitated, especially after Plaintiff exchanged the patient's silverware for plasticware, and threatened Plaintiff. *Id.* at ¶¶20–22. Consequently, Plaintiff asked nurse Roslyn Martin ("Martin") to contact the V.A. Police Department, purportedly in accordance with hospital policy. *Id.* at ¶23.

Shortly thereafter, Dr. Azneer arrived in the room with Martin. *Id.* at ¶24. When Plaintiff explained what had occurred, Dr. Azneer countermanded Plaintiff's request to contact the V.A. Police Department, pointed his finger at Plaintiff, poked Plaintiff in the forehead, pushed Plaintiff's chest, and told Plaintiff to "sit his black self down and do his job." *Id.* (internal quotation marks omitted). Plaintiff "stepped back in a defensive manner" after Dr. Azneer pushed him. *Id.* at ¶25. Dr. Azneer "raised his cane in a threatening manner" towards Plaintiff, and the two men shouted at each other. *Id.* at ¶26. Dr. Azneer subsequently exited the room again and went to the nursing station. *Id.* at ¶27. Plaintiff also exited the room, but nurse Shannon Norman Spurlock ("Spurlock") grabbed Plaintiff. *Id.* at ¶28. Spurlock refused to release Plaintiff from her grip, despite Plaintiff's requests and assurances that he was calm. *Id.* After leaving the nursing station, Dr. Azneer swung his cane at Plaintiff, while Spurlock restrained Plaintiff, in an attempt to hit Plaintiff. *Id* at ¶29. Plaintiff broke free from Spurlock's restraint and ducked to avoid the swing. *Id.* at ¶30. Plaintiff departed from this area and sat on a bench. *Id.* at ¶31. Spurlock followed him and sat on his lap. *Id.* Supervisor Donna Butler advised Plaintiff to go home. *Id.* at ¶32.

2

Before Plaintiff could leave, Christopher Anglin ("Anglin"), a Caucasian Bay Pines V.A. police officer, instructed him to stay for the investigation of the incident.[2] *Id.* at ¶¶33, 34. During this time, Anglin sequestered Plaintiff with another police officer, but did not sequester Dr. Azneer, Spurlock, both of whom are also Caucasian, or any other individuals involved with the incident. *Id.* at ¶¶33, 34. Anglin made no attempt to learn or investigate Plaintiff's perspective of the incident. *Id.* at ¶34. Although Plaintiff expressed his desire to press charges against Dr. Azneer three times, Anglin did not acknowledge these requests. *Id.* Dr. Azneer was permitted to stand over witnesses as they offered their statements regarding the incident. *Id.* Furthermore, Anglin and Dr. Azneer pressured Spurlock to write a statement that Plaintiff harmed her, yet she later recanted her statement. *Id.* Once Anglin completed his investigation, he returned to Plaintiff and asked Plaintiff to waive his right to a union representative. *Id.* Plaintiff agreed to waive this right because he hoped that Anglin would take his statement, but Anglin instead arrested Plaintiff for battery. *Id.* Anglin handcuffed Plaintiff and transported him to jail. *Id.* at ¶35.

Following his arrest, Plaintiff was placed on administrative duties, which "depriv[ed] him of overtime and compensation." *Id.* at ¶38. Plaintiff was allegedly imprisoned and deprived of his liberty without probable cause. *Id.* at ¶36. Plaintiff filed a complaint with the Department for racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), on April 5, 2016. *Id.* at ¶11. Plaintiff purportedly faced retaliation during the EEO process. *Id.* at ¶37. Debbie Williams ("Williams") and Kristine Konstantakos ("Konstantakos") asked Plaintiff to drop his Charge of Discrimination on or about December 13,

---

[2] Plaintiff also alleges that Anglin previously restrained him, handcuffed him, threatened him with a firearm and pepper spray, and issued a citation to him in 2014. (Doc. 1 ¶14). Anglin stalked Plaintiff following this incident, and Plaintiff "feels that he was racially profiled by Anglin." *Id.* at ¶¶15–16. Once Plaintiff communicated this purported harassment to the Bay Pines V.A. Chief of Police, Anglin "temporarily" ceased his alleged harassment of Plaintiff. *Id.* at ¶17.

2016. *Id.* at ¶39. Williams aggressively attempted to pressure Plaintiff into "removing" his Charge of Discrimination "because it was in his best interest." *Id.* at ¶40 (internal quotation marks omitted). Plaintiff also claims that the Department gave Plaintiff's contact information to the Federal Bureau of Investigation ("FBI") "and otherwise conspired to pressure [Plaintiff] into not speaking out" regarding the Charge of Discrimination. *Id.* at ¶41. A purported FBI agent identifying herself as "Sonya Young" demanded access to Plaintiff's residence and questioned Plaintiff about his social media postings discussing his discrimination, retaliation, and the underlying facts. Plaintiff felt threatened by this conduct and unannounced visit. *Id.* Plaintiff also claims that his supervisor notified him "of a fact finding" on March 17, 2018, the day before his deposition, and questioned him about his "harassment" of Anglin. *Id.* at ¶42 (internal quotation marks omitted). The Department issued a final decision on April 9, 2019. *Id.* at ¶12. Plaintiff initiated this action on September 6, 2018, (Doc. 1 at 1), and filed his operative complaint on May 21, 2019, (Doc. 39 at 11).

### B.  Procedural Background

Plaintiff brings this action against the United States of America, and Robert L. Wilkie, Secretary of the Department. *Id.* at ¶¶43–69. Plaintiff's operative complaint contains four claims. *Id.* First, Plaintiff brings a claim for "false arrest/false imprisonment and detention" under Florida law via the Federal Tort Claims Act, 28 U.S.C. § 2674, contending that the actions of the United States, by and through its agents and employees, "such as Anglin, constitute false arrest/false imprisonment and detention" of Plaintiff. *Id.* at ¶46. Next, Plaintiff brings a claim against Robert Wilkie, Secretary of the Department, for racial discrimination under Title VII, alleging that the Department subjected him to adverse employment actions by supervisory or non-supervisory personnel and that the actions described herein constituted a hostile work environment. *Id.* at ¶¶51,

53–54. Plaintiff also sues Robert Wilkie as the Secretary of the Department for retaliation under Title VII, contending that the Department subjected him to harassment and intimidation after he engaged in protected activity under Title VII by reporting racial discrimination and filing a complaint of discrimination. *Id.* at ¶¶58, 60–62. Finally, Plaintiff brings an assault claim, alleging that Dr. Azneer raised his cane in a threatening manner and swung his cane at Plaintiff to cause bodily harm, thereby causing Plaintiff to be in reasonable fear that Dr. Azneer would batter him. *Id.* at ¶¶64–69. This claim was initially lodged against Dr. Azneer individually, but the United States has been substituted for Dr. Azneer in accordance with the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679 (the "Westfall Act") (Docs. 16 at 1–2; 44 at 14).

In support of its substitution, the United States provided the United States Attorney for the Middle District of Florida's certification that Dr. Azneer constituted a governmental employee acting in the scope of federal office or employment at the time of, and with respect to, the facts out of which Plaintiff's claim arises (the "Certification"). (Doc. 16-1 at 1). Plaintiff objected to the substitution. (Doc. 27 at 2–4). The Court declined to strike or otherwise deny the substitution of the United States for Dr. Azneer, stating that the United States would remain substituted for Dr. Azneer because the Court had not determined that Dr. Azneer, in fact, and not simply as alleged by Plaintiff, engaged in conduct beyond the scope of his employment. (Doc. 44 at 12, 14). However, given the fact-intensive nature of the inquiry, Plaintiff's allegations, and the response of Defendants,[3] the Court exercised its broad discretion to order discovery limited to whether Dr. Azneer acted within the scope of his employment. *Id.* at 12–13. *See also Glover v. Donahue*, 626

---

[3] As the responses in opposition to the pending motions are styled such that they are made on behalf of the United States, the Department, *and* Dr. Azneer, the Court utilizes "Defendants" throughout this Order to refer to all three parties simply for ease of reference.

F. App'x 926, 930 (11th Cir. 2015) (holding that discovery and an evidentiary hearing were unnecessary where a plaintiff alleged *no facts* to support his contention that a federal employee defendant acted outside the scope of employment at the time of the alleged wrongdoing) (emphasis added). The Court explained that Plaintiff may renew his challenge, if he desired, following the completion of this discovery. (Doc. 44 at 13).

Now, following the completion of the limited discovery, Plaintiff renews his challenge to the Certification, (Doc. 45 at 2–4), which Defendants oppose, (Doc. 47 at 7–9). As explained in further detail below, the Court held an evidentiary hearing on Plaintiff's renewed challenge on August 25, 2020. (Doc. 82). The Court subsequently advised during a telephonic status conference on September 15, 2020, that it found that Dr. Azneer was acting within the scope of his employment and that a written order would follow. The Court now issues its written order denying the Renewed Challenge.

Defendants also move to dismiss Plaintiff's retaliation claim (Count III) and Plaintiff's assault claim (Count IV). (Doc. 40 at 6–8). Defendants contend that Plaintiff purportedly failed to exhaust his administrative remedies for his retaliation claim, or the claim is otherwise time-barred. *Id.* at 6–7. Additionally, Defendants also argue that the Court must dismiss Plaintiff's assault claim under Rule 12(b)(1) because the United States has been properly substituted for Dr. Azneer and the United States enjoys sovereign immunity for lawsuits arising out of assaults committed by persons who are not investigative or law enforcement officers. *Id.* at 8.

The Motion to Dismiss and the Renewed Challenge are thus ripe for the Court's consideration.

## II. RENEWED CHALLENGE

The Court begins with the Renewed Challenge. For the reasons set forth below, the Renewed Challenge is due to be denied.

### A. Legal Standard

Absent a waiver, sovereign immunity shields the United States and its agencies from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "The terms of the federal government's consent to be sued in any court define that court's jurisdiction to entertain the suit." *JBP Acquisitions, LP v. United States ex rel. F.D.I.C.*, 224 F.3d 1260, 1263 (11th Cir. 2000) (internal quotations omitted). Congress must unequivocally express a waiver of sovereign immunity. *Albajon v. Gugliotta*, 72 F. Supp. 2d 1362, 1366 (S.D. Fla. 1999). The Federal Tort Claims Act (the "FTCA") provides a limited waiver of such sovereign immunity to permit persons injured by federal employee tortfeasors to file a lawsuit in federal district court against the United States. 28 U.S.C. §§ 1346(b), 2674. The FTCA provides that federal district courts have exclusive jurisdiction over any claim against the federal government arising out of the act of a federal employee performed within the scope of his employment duties:

> Subject to the provisions of chapter 171 of this title, the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* § 1346(b). *See also Meyer*, 510 U.S. at 477 (identifying the elements of the statute).

Further, the Westfall Act provides, in relevant part:

> The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury

> or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee.

28 U.S.C. § 2679(b)(1).

However, there are certain exceptions to this limited waiver of sovereign immunity. Relevant here, "[t]he provisions of this chapter and section 1346(b) shall not apply to . . . any claim arising out of assault . . . ." *Id.* § 2680(h). "If one of the exceptions applies, the bar of sovereign immunity remains." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 485 (2006).

The purpose of the Westfall Act is to "protect Federal employees from personal liability for common law torts committed within the scope of their employment, while providing persons injured by the common law torts of Federal employees with an appropriate remedy against the United States." Westfall Act, Pub. L. No. 100-694, § 2(b), 102 Stat. 4563 (1988). To that end, the Westfall Act allows the United States Attorney General to certify that a defendant federal employee was acting within the scope of his or her office or employment at the time of the incident out of which the claim arose, which thereby allows the United States to be substituted for the federal employee in a lawsuit for such action. 28 U.S.C. § 2679(d)(1). The authority to make such certification has been delegated to the United States Attorney for the district where the civil action is brought. 28 C.F.R. § 15.4. When such certification is made, the civil action shall proceed in the same manner as an action against the United States pursuant to the FTCA and shall be subject to the exceptions and limitations applicable to those actions. 28 U.S.C. § 2679(d)(4).

Upon the certification of the Attorney General, the federal employee is dismissed from the action, and the United States is substituted as defendant in the employee's place. *Osborn v. Haley*, 549 U.S. 225, 230 (2007). Indeed, "if an action is commenced in a federal court, and the Attorney

General certifies that the employee 'was acting within the scope of his office or employment at the relevant time,' the United States *must* be substituted as the defendant." *Id.* at 241 (quoting 28 U.S.C. § 2679(d)(1)) (internal alterations omitted) (emphasis added). Thereafter, the litigation is governed by the FTCA. *Id.* at 230.

However, the Attorney General's certification is subject to judicial review. *Gutierrez de Martinez v. Lamango*, 515 U.S. 417, 434 (1995); *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1542 (11th Cir. 1990), *amended by*, 924 F.2d 1555 (11th Cir. 1991). The Attorney General's certification thus does not conclusively establish that the United States' substitution as the defendant is proper. *Gutierrez de Martinez*, 515 U.S. at 434. The Westfall Act is construed to allow a plaintiff to present to the district court any objections regarding the Attorney General's scope of employment certification. *Id.* at 436–37.

If a plaintiff challenges the scope of employment certification, the district court must review such certification *de novo*. *See Flohr v. Mackovjak*, 84 F.3d 386, 390 (11th Cir. 1996). In conducting a *de novo* review of a certification, "'the question of whether a given act falls within the scope of employment is highly fact-specific, and turns on the unique circumstances of the case at bar.'" *Hendrix v. Snow*, 170 F. App'x 68, 82 (11th Cir. 2006) (internal alterations omitted) (quoting *Bennett v. United States*, 102 F.3d 486, 489 (11th Cir. 1996)). Significantly, the "burden of altering the status quo by proving that the employee acted outside the scope of employment is . . . on the plaintiff." *Flohr*, 84 F.3d at 390 (alteration in original) (internal quotation marks omitted). While at least one district judge within the Middle District of Florida has adopted the preponderance of the evidence standard taken by the Fourth Circuit, neither the Supreme Court nor the Eleventh Circuit has recognized that standard as applicable. *Omnipol, a.S. v. Worrell*, 421 F. Supp. 3d 1321, 1338–39 (M.D. Fla. 2019), *appeal filed*, No. 19-14597. The Supreme Court has

explained that the United States "must remain the federal defendant in the action unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn*, 549 U.S. at 231 (emphasis in original). "Substitution of the United States is not improper simply because the Attorney General's certification rests on an understanding of the facts that differs from the plaintiff's allegations." *Id.*

Finally, "[t]he question of whether an employee's conduct was within the scope of his employment is governed by the law of the state where the incident occurred." *Flohr*, 84 F.3d at 390 (internal quotation marks omitted). An employee's conduct falls within the scope of his or her employment under Florida law where the employee's conduct: (1) is of the kind he or she was employed to perform; (2) occurs "substantially within the time and space limits authorized or required by the work to be performed"; and (3) is "activated at least in part by a purpose to serve the master." *Fields v. Devereaux Found., Inc.*, 244 So.3d 1193, 1196 (Fla. 2d DCA 2018) (internal quotations omitted) (quoting *Iglesia Christiana La Casa Del Senor, Inc. v. L.M.*, 783 So.2d 353, 357 (Fla. 3d DCA 2001)).

### B. Analysis

In renewing his challenge to the Certification following the completion of limited discovery, Plaintiff provides his testimony in an affidavit, the deposition testimony of Dr. Sanja Krnic-Barrie ("Dr. Barrie"[4]), and the deposition testimony of Martin. (Docs. 45-1, 45-2, 45-3). Plaintiff's affidavit and Martin's deposition testimony are offered generally to claim that Dr. Azneer assaulted Plaintiff. *See* (Doc. 45 at 2). The deposition of Dr. Barrie is offered to undercut the Certification's veracity. *See id.* at 3. Dr. Barrie, who has intermittently served as Chief

---

[4] At the evidentiary hearing, the doctor identified herself as "Dr. Sanja Barrie." (Doc. 87 at 214:8–10). Thus, the Court will refer to her as "Dr. Barrie."

Hospitalist for Bay Pines, (Doc. 45-2 at 5:16–23), previously declared under penalty of perjury that Dr. Azneer acted within the scope of his employment, (Doc. 31-1 at 1), upon which the Certification relied—together with the first complaint's allegations[5]—to conclude that Dr. Azneer acted within the scope of his employment, (Doc. 16-1 at 1). However, in this subsequent deposition, Dr. Barrie stated that her basis for making the certification was simply that Dr. Azneer was on call and seeing patients that day. (Doc. 45-2 at 11:4–8). She admitted that she did not witness the events and generally avoided answering whether Dr. Azneer's alleged actions constituted something that he was hired to do. *Id.* at 12:21–25, 13:1. Plaintiff argues that, because Dr. Barrie's declaration, in which she stated that Dr. Azneer acted within the scope of employment, served as a basis for the Certification and Dr. Barrie could not sufficiently explain how Dr. Azneer acted within the scope of his employment, Dr. Azneer should be resubstituted for the United States. (Doc. 45 at 2–3). Plaintiff's argument relies on facts offered in Plaintiff's affidavit and Martin's deposition to show that Dr. Azneer assaulted Plaintiff, but Plaintiff does not provide an analysis for how Dr. Azneer's actions fall outside his scope of employment under the applicable test, aside from a conclusory assertion at the end of the Renewed Challenge. *Id.* at 4.

In opposing the Renewed Challenge, Defendants, for the first time, dispute Plaintiff's allegations and provide their own recounting of the facts. Defendants provide several exhibits, including the declaration of Dr. Azneer, the declaration of charge-nurse Michele Dean ("Dean"), Dr. Azneer's deposition, and the declaration of attorney Lance M. Litman ("Litman"). (Docs. 47-1, 47-2, 47-3, 47-6). Defendants rely on their provided evidence to argue that Plaintiff initially

---

[5] Just like the operative complaint, the first complaint alleged that Dr. Azneer raised his cane in a threatening manner in the hospital room and subsequent swung his cane at Plaintiff. (Doc. 1 ¶¶22, 25).

became angry with Dr. Azneer, yelled profanities at Dr. Azneer, and followed him out of the hospital room into the hallway. (Doc. 47 at 3). Based on Dr. Azneer's declaration, Defendants argue that Dr. Azneer feared Plaintiff and gripped the shaft of his cane in a "defensive manner" in the hallway, but otherwise turned away from Plaintiff and continued walking away from Plaintiff while Plaintiff followed Dr. Azneer down the hallway and yelled profanities at him. *Id.* at 4. As both Dr. Azneer and Dean state in their declarations that Dr. Azneer did not swing his cane at Plaintiff, (Docs. 47-1 ¶10; 47-2 ¶6), Defendants dispute Plaintiff's assertion that Dr. Azneer did so, (Doc. 47 at 5).

Defendants argue that Dr. Azneer's actions were taken on hospital property while he was making the rounds and his conflict with Plaintiff arose from a dispute over the appropriate action to take in providing care to a suicidal patient. *Id.* at 9. According to Defendants, Dr. Azneer, as the attending physician, maintained the responsibility and authority to override Plaintiff's instructions, switch Plaintiff with a different aide, and act in the best interests of the patient *Id.* Defendants claim that Dr. Azneer's actions were undertaken to deescalate the "volatile" situation caused by Plaintiff. *Id.* (internal quotation marks omitted). Defendants argue that Plaintiff "has not offered evidence sufficient to disprove that Dr. Azneer's actions were motivated, at least in part, by his desire to serve the interests" of the Department.[6] *Id.* Finally, Defendants argue that, even if

---

[6] Whether Defendants offer this point as a conclusion, for which their other arguments are offered in support, or as a separate argument intended to address the third prong of the scope-of-employment test under Florida law is unclear. In their recitation of applicable legal principles, Defendants quote *Omnipol, a.S. v. Worrell* for the proposition that "[so] long as an act is undertaken at least *in part* to serve the employer, an employee will still be acting within the scope of his employment." (Doc. 47 at 8) (emphasis in original) (internal quotation marks omitted). In *Omnipol*, the court noted that the plaintiffs focused their argument to defeat substitution on the *third* prong of the scope-of-employment test under Florida law, as they argued that, under their allegations, the federal employees' actions were not undertaken to serve the Government, but instead completed to serve the employees' own personal avarice or were undertaken in contravention of the Government's policies and procedures. *Omnipol*, 421 F. Supp. 3d at 1340.

Plaintiff's allegations are taken as true, Plaintiff has still failed to establish that Dr. Azneer was not acting, at least in part, to serve the interests of the Department.[7] *Id.*

The provided evidence also revealed to the Court the potential for the validity of the Certification to overlap with the merits of Plaintiff's assault claim. In such instances, district courts have held evidentiary hearings regarding the underlying factual dispute to evaluate credibility. *See*, *e.g.*, *Taite v. Morin*, 521 F. Supp. 2d 141, 143 (D.N.H. 2007); *Loehndorf v. United States*, No. C14-0106JLR, 2014 WL 3752120, at *4 (W.D. Wash. July 30, 2014). "The overlap of certification validity and the merits of the plaintiff's claim . . . is uncommon," and "even when the plaintiff alleges an intentional tort, it may be possible to resolve the scope-of-employment question without deciding the merits of the claim." *Osborn*, 549 U.S. at 252 n.15. Judges have a greater factfinding role in Westfall Act cases and these immunity related issues should be decided at the earliest opportunity. *Id.* at 252 n.15, 253. Based on the nature of the submitted arguments, the extent of conflicting evidence, and the potential for the validity of the Certification to overlap with the merits of Plaintiff's assault claim, the Court held an evidentiary hearing on August 25, 2020 to determine whether Dr. Azneer acted outside the scope of his employment, a finding of which would result in the Court granting the Renewed Challenge. *See* (Docs. 51, 86). Plaintiff presented two witnesses

---

The court rejected that argument with the quoted language. Thus, the Court merely reiterated the *third prong* of the scope-of-employment test under Florida law.

[7] The Court's *de novo* review of the Certification necessarily extends beyond Plaintiff's allegations, however. The Supreme Court has emphasized that the United States "must remain the federal defendant in the action unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn v. Haley*, 549 U.S. at 231 (emphasis in original). The Court previously ordered limited discovery, thereby allowing it to examine *evidence*. The focus, therefore, is on submitted evidence.

during the hearing: himself and Martin. Defendants presented four witnesses: Dr. Azneer, Dean, Litman, and Dr. Barrie.

During the evidentiary hearing, Plaintiff testified that Dr. Azneer "riled up" the suicidal patient by initially claiming that he did not have time to deal with the patient and rushing out of the room. (Doc. 87 at 20:3–9). The patient "started acting out, mumbling under his breath and just saying things" afterwards, and Plaintiff claimed that the patient "started going off" once Plaintiff sought to replace the silverware for plasticware. *Id.* at 20:10–16, 21:10–13. Plaintiff testified that, after Dr. Azneer arrived into the room, he said to Plaintiff, "[Y]ou need to sit down and do your job, stay in your place." *Id.* at 23:23–25. Of course, this testimony is markedly different from Plaintiff's statement in his declaration that Dr. Azneer told Plaintiff to "sit his black self down and do [his] job." (Doc. 45-1 ¶5) (internal quotation marks omitted). Plaintiff testified that the only other people in the room when Dr. Azneer arrived were Dr. Azneer, the patient, and Martin. *Id.* at 27:10–15. Plaintiff also testified that Dr. Azneer pushed Plaintiff in the forehead, pushed Plaintiff in the chest, and raised his cane "probably about between his nose and his mouth or whatever." *Id.* at 23:25, 24:1–7. Although alleged in the operative complaint, Plaintiff's declaration does not mention Dr. Azneer raising his cane in the room.

Plaintiff testified that, while Spurlock "grabbed both of [his] wrists" after Dr. Azneer had left the room for the nurses' station, where Dean was located, Dr. Azneer "walked up" towards Plaintiff "real fast" and "swung [his] cane like a baseball bat." *Id.* at 30:5–13, 32:6–8. Plaintiff "twisted [his] wrists downward, dropped down, duck[ed]" and Spurlock "flew to the wall." *Id.* at 32:8–10. Plaintiff testified that the only other individuals who were present when Dr. Azneer re-approached him, aside from Plaintiff and Dr. Azneer, were Martin, Spurlock, and another patient. *Id.* at 33:13–14. Spurlock nor the other patient testified. Further, although Plaintiff maintained that

14

the patient was "outside her room in the hallway," he was unable to specify the patient's location in the hallway when prompted. *Id.* at 85:9–23, 86:4–7.

Martin, Plaintiff's only other witness, testified that Dr. Azneer "became really agitated" in the hospital room after discussing Plaintiff's decision to revoke the patient's silverware and "took his fingers . . . and hit [Plaintiff's] chest." *Id.* at 97:1–3. A few minutes later, according to Martin, Dr. Azneer "did it to his forehead" and told Plaintiff to "sit his black ass down." *Id.* at 97:4–6. As previously mentioned, Plaintiff omitted any mention of this language from his testimony. Martin also claimed that Dr. Azneer "grabbed his cane and raised it up to about, I don't know, like kind of face level" towards Plaintiff while Plaintiff and Dr. Azneer argued, at which point she told the two men to leave the room. *Id.* at 100:13–25. Martin asserted that Dean was in the room at one point, but that she was not present when Dr. Azneer poked Plaintiff because Plaintiff had told her to call the police. *Id.* at 96:3–4, 99:14–18, 100:6–10. Dean testified that Martin was not in the room when she first arrived with Dr. Azneer, but that she entered the room at some point during the assessment and was present in the room when Dean left to call her supervisor. *Id.* at 195: 23–25, 204:15–19.

Martin further testified that Dr. Azneer thereafter "was coming down the hallway very quickly" from the nurses' station and Plaintiff "was trying harder to get [Spurlock] off of holding his arm and she wasn't budging." *Id.* at 108:13–19. According to Martin, Plaintiff "kind of twisted his arm and got her to let go" and, at the same time, "Dr. Azneer was approaching with his cane up in the air and swung the cane, miss[ing] Plaintiff, because I think it was like he had dipped down or bent down or something when he had gotten [Spurlock] off of his arm, and it happened really fast." *Id.* at 109:14–24. Finally, Martin testified that during a debriefing session between the Department's attorney, Dr. Azneer, Dean, another attorney, and herself following depositions

during the EEO process, Dr. Azneer admitted that he swung his cane at Plaintiff and explained that he did so because Plaintiff is "a big black man." *Id.* at 110:8–25, 111:1–13.

Dr. Azneer and Dean testified to an entirely different version of events from Plaintiff and Martin. Dr. Azneer testified that he did not take issue with Plaintiff's decision to switch the utensils and that Plaintiff became upset and challenging once Dr. Azneer sought to switch sitters as a result of the patient's fear of Plaintiff. *Id.* at 152:7–25, 153:1–25, 154:1–9. This testimony is consistent with Dr. Azneer's declaration and deposition. (Docs. 47-1 ¶¶4–5, 47-3 at 4:15–25, 5:1–6). Dr. Azneer testified that he told Plaintiff that "he should sit down and calm down" because Plaintiff's behavior was "escalating a bad situation." (Doc. 87 at 153:10–18). Dr. Azneer described Plaintiff's behavior as "very threatening," "challenging," and "increasingly accusatory." *Id.* at 154:22–23, 155:3, 160:19–20. According to Dr. Azneer, he departed from the room "[t]o take it away from the patient's bedside." *Id.* at 161:2–3.

Dr. Azneer claimed that, as he walked towards the nurses' station, Plaintiff followed him down the hall, yelling vulgar language towards him. *Id.* at 161:10–24. Again, this testimony is consistent with Dr. Azneer's declaration and deposition. (Docs. 47-1 ¶5; 47-3 at 6:21–25). Dr. Azneer testified that, as he was walking away, he turned to face Plaintiff "to stare him down, I guess, to see if he would stop." (Doc. 87 at 161:2–3). When Dr. Azneer did this, he pulled his cane up to his chest in a "defensive posture," placing his hand "on the flat part of the cane below the crook" and bringing it up to his chest. *Id.* at 161:3–7, 9–15. Dr. Azneer did this because he was "frightened" and Plaintiff was "right there." *Id.* at 161:6–8. Spurlock had attempted to place herself between Dr. Azneer and Plaintiff, and Dr. Azneer heard her tell Plaintiff that he was hurting her. *Id.* at 163:9–16. Dr. Azneer explicitly testified that he never poked Plaintiff, pushed Plaintiff, raised his cane at Plaintiff, swung his cane at Plaintiff, tried to hit Plaintiff, or made any physical

16

contact with Plaintiff. *Id.* at 166:14–25, 167:1–3. This testimony is also consistent with Dr. Azneer's declaration and deposition. (Docs. 47-1 ¶¶10–11;47-3 at 6:14–20). The only potentially damaging testimony that Plaintiff was able to elicit from Dr. Azneer during a brief cross-examination was Dr. Azneer's admission that he did not write in his initial witness statement that he had raised his cane to his chest. (Doc. 87 at 170:1–3).

Consistent with Dr. Azneer's testimony and her declaration, (Doc. 47-2 ¶3), Dean testified that Plaintiff became agitated when Dr. Azneer sought to switch sitters and, after Dr. Azneer told Plaintiff to "please go sit down," Plaintiff "became very upset and starting yelling at Dr. Azneer," (Doc. 87 at 183:10–12). According to Dean, while she was in the room, Dr. Azneer never referred to Plaintiff's race. *Id.* at 183:20–24. She did not observe Dr. Azneer raise his cane towards Plaintiff. *Id.* at 185:10–12. After Dean finished calling her supervisor from the nurses' station, she observed Dr. Azneer and Plaintiff in the hallway, noting that Dr. Azneer was "trying to get away from Plaintiff." *Id.* at 188:2. Like Dr. Azneer's testimony, Dean emphasized that, as Dr. Azneer took a step back from Plaintiff, he "raise[d] his cane up to his chest as in defense mode" since Plaintiff "was still coming towards him." *Id.* at 187:18–20. Dean echoed Dr. Azneer's testimony that Dr. Azneer never swung his cane towards Plaintiff at any point. *Id.* at 190:16–18.

In addition to the flaws highlighted above, the testimony of both Plaintiff and Martin raised numerous credibility concerns. Plaintiff testified only that Dr. Azneer told him to sit down and do his job, and he did not recall alleging in his EEO complaint that Dr. Azneer told him to sit his "black self down." *Id.* at 55:1–4, 24–25, 56:1. Plaintiff testified that a gathering at a restaurant for an employee's birthday constituted the only occasion in which he spent time with Martin outside of work, yet Martin testified that Plaintiff also helped her move. *Id.* at 57:23–25, 58:1–2, 130:16–23. Further, although Plaintiff claimed that the patient threatened him, Martin testified that this did

not occur. *Id.* at 21:20–25, 22:1–18; 113:17–20. Defendants also successfully impeached Plaintiff several times. First, Defendants impeached Plaintiff with his first complaint for employment discrimination, filed with the Department, after he testified that the patient did not claim that he did not want Plaintiff to watch him any longer. *Id.* at 67:25, 68:1–2, 69:17–25, 70:1. Second, Defendants impeached Plaintiff with the same complaint after he testified that the patient did not state that he wanted Plaintiff to leave the room. *Id.* at 70:2–4, 71:25, 72:1–9. Third, despite Plaintiff's testimony that he did not raise his fist in "defense mode" during the incident when Dr. Azneer purportedly raised his cane, Defendants highlighted that Plaintiff testified during a prior deposition that he did raise his fist. *Id.* at 77:25, 78:1–4, 80:1–11. And although Plaintiff stated that he could not recall directing certain foul language towards Dr. Azneer in the room, Defendants pointed out that Plaintiff previously admitted to using such language during his deposition. *Id.* at 81:22–24, 82:6–21.

Martin's testimony raised similar concerns. Despite her claim that Dr. Azneer admitted during the debriefing that he swung his cane at Plaintiff because Plaintiff is "a big black man," Dr. Azneer, Litman, and Dean claimed that Dr. Azneer never made this admission. *Id.* at 168:1–16, 192:15–25, 1–5, 211:4–15. The Court finds the testimony of Litman, an attorney who volunteered for the Department, to be particularly credible. Consistent with his declaration, (Doc. 47-6 ¶5), Litman testified that he was present for this meeting and Dr. Azneer did not: (i) admit to swinging his cane at Plaintiff; (ii) admit that he raised and swung his cane at Plaintiff because Plaintiff "was a big black man"; (iii) make any comments about Plaintiff's race; or (iv) say anything that was inconsistent with his deposition testimony, (Doc. 87 at 211:4–15). Significantly, Litman testified that he would have noticed if Dr. Azneer had said something contrary to his deposition testimony and, therefore, committed perjury. *Id.* at 211:16–23. Additionally, the first time that Martin

18

claimed that Dr. Azneer referred to Plaintiff's race was in her deposition, which occurred more than two years after the incident and, even so, she testified that Dr. Azneer "said something to him about getting his black self back in," not that Dr. Azneer told Plaintiff to "sit [his] black [ass] down." *Id.* at 126:8–25, 127:9–25, 128:1–3. At the time of her deposition, Martin was also unsure whether Dr. Azneer had made the comment in the hallway or in the room. *Id.* at 128:4–7. In her initial statement to the police, Martin did not recount any remark by Dr. Azneer regarding Plaintiff's race, Dr. Azneer poking Plaintiff in the forehead, or Dr. Azneer swinging his cane. *Id.* at 119:7–15, 120:8–11. Martin admitted that she spoke with Plaintiff about the incident after it occurred, but claimed she could not recall the details of that conversation. *Id.* at 131:15–120. She was "not 100 percent" sure whether she spoke with Plaintiff prior to her deposition, but thinks that she "probably did" speak with Plaintiff afterwards. *Id.* at 131:25, 132:1–10. Without solicitation, Martin prepared her own statement of facts following her deposition because she "felt that things weren't handled properly" and she was "disturbed" by the debriefing session. *Id.* at 132:12–24. She subsequently made changes to this version of her statement and sent both statements to Plaintiff. *Id.* at 134:6–12, 139:22–23. Plaintiff was the intended audience, and Martin "felt [Plaintiff] should know about the changes." *Id.* at 137:22–24, 140:2–5.

Plaintiff has failed to carry his burden of altering the status quo by proving that Dr. Azneer acted outside the scope of his employment. The testimony and evidence offered by Plaintiff in seeking to challenge the United States' substitution for Dr. Azneer is directly contradicted by the testimony and evidence offered by Defendants. Further, the identified deficiencies undermine the credibility of, and weight afforded to, the evidence offered by Plaintiff. The United States must remain the federal defendant unless and until the Court determines that Dr. Azneer *in fact* engaged in conduct beyond the scope of his employment. A review of the evidence simply does not

19

demonstrate that Dr. Azneer *in fact* engaged in conduct beyond the scope of his employment. In light of Plaintiff's failure to carry his burden, the Certification shall stand and, therefore, the Court finds that Dr. Azneer acted within the scope of his employment. This conclusion is grounded in Plaintiff's failure to carry his burden of altering the status quo, not whether certain events actually transpired. As such, the Renewed Challenge is due to be denied.

### III. MOTION TO DISMISS

Defendants seek to dismiss only the retaliation claim and the assault claim under Rule 12(b)(6) and Rule 12(b)(1), respectively. (Doc. 40 at 6–8). For the reasons set forth below, the Motion to Dismiss is due to be granted-in-part and denied-in-part.

#### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id*. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not sufficient. *Id*. A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The Court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id*.

Under Rule 12(b)(1), a defendant, in responding to a claim for relief in a pleading, may raise the defense of lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A defendant may

attack subject matter jurisdiction in two manners: facially or factually. *McMaster v. United States*, 177 F.3d 936, 940 (11th Cir. 1999). While a facial attack on subject matter jurisdiction merely requires a court, assuming the allegations of the complaint as true, to determine whether the complaint sufficiently alleges a basis for jurisdiction, *McElmurray v. Consolid. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)), a factual attack "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered,'" *Lawrence*, 9191 F.2d at 1529 (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980), *cert. denied*, 449 U.S. 953 (1980)).

### B.  Analysis

#### i.  Retaliation Claim

##### 1.  Preliminary Considerations

Defendants move to dismiss Plaintiff's retaliation claim under Rule 12(b)(6) on the basis that Plaintiff failed to exhaust his administrative remedies and the claim is untimely. (Doc. 40 at 6–7) ("Accordingly, all of Plaintiff's retaliation allegations should be dismissed under Rule 12(b)(6)."). At the outset, the Court notes that the Eleventh Circuit has generally held that "a federal employee must pursue and exhaust her administrative remedies as a *jurisdictional* prerequisite to filing a Title VII action." *Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999) (emphasis added).[8] However, Defendants designate their challenge as one for failure to state a

---

[8] *But see Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1846 (2019) (explaining that "[p]rerequisites to suit like Title VII's charge-filing instruction" under § 2000e-5 for a complainant to file a charge with the EEOC prior to filing a civil action "are properly ranked among the array of claim-processing rules that must be timely raised to come into play"); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (holding that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling"). Separately, a panel of

claim under Rule 12(b)(6), rather than a jurisdictional challenge under Rule 12(b)(1). Plaintiff does not object to this designation. As such, in light of both parties' reliance on Rule 12(b)(6), the Court will resolve Defendants' challenge to the retaliation claim utilizing the standards of Rule 12(b)(6).

In moving to dismiss the retaliation claim, Defendants attach numerous documents to the Motion to Dismiss: (1) an April 5, 2016 complaint of employment discrimination; (2) an AMSCOT fax coversheet; (3) a Department Notice of Rights and Responsibilities form, signed by Plaintiff and dated April 5, 2016; (4) a July 6, 2017 complaint of employment discrimination; (5) a June 23, 2017 e-mail from EEO Counselor Kelley Schafer ("Schafer") to Plaintiff's counsel; (6) a June 16, 2017 letter on Department letterhead from Schafer to Plaintiff's attorney; (7) a July 6, 2017 e-mail from Plaintiff's attorney; (8) an August 24, 2017 Notice of Final Agency Decision; and (9) an administrative judge's order adopting and granting the Department's motion for summary judgment. (Docs. 40-1, 40-2, 40-3, 40-4). In a footnote appended to a citation to one of these exhibits, Defendants simply cite an Eleventh Circuit case that articulates an exception to the general prohibition on looking beyond the four corners of a complaint on a Rule 12(b)(6) motion. (Doc. 40 at 3 n.2). Defendants apparently seek the Court's consideration of the exhibits on this basis.

---

the Eleventh Circuit has held, in an unpublished opinion, that the two-step requirement for exhaustion of administrative remedies under the Prison Litigation Reform Act applied to a defendant's "Rule 12(b) motion to dismiss" for a Title VII claim. *Tillery v. U.S. Dep't of Homeland Sec.*, 402 F. App'x 421, 422–23 (11th Cir. 2010). This requirement "directs the district court to resolve factual disputes as to exhaustion of administrative remedies on a motion to dismiss if (1) the factual disputes do not decide the merits of the claims and (2) the parties have had sufficient opportunity to develop the record." *Id.* at 423. As an unpublished decision, *Tillery* is merely persuasive authority. 11th Cir. R. 36-2. Regardless, and in the absence of any supporting argument otherwise, the Court heeds the designation of the motion as one under Rule 12(b)(6) and resolves the challenge utilizing the standards thereunder.

Plaintiff also provides the Court with documents for consideration. Indeed, Plaintiff also provides the April 5, 2016 complaint of employment discrimination, the AMSCO fax coversheet, the Department Notice of Rights and Responsibilities form, the July 6, 2017 complaint of employment discrimination, the June 23, 2017 e-mail from Schafer, the June 16, 2017 letter from Schafer, the July 6, 2017 e-mail from Plaintiff's attorney, and the August 24, 2017 Notice of Final Agency Decision. (Docs. 43-1, 43-3, 43-4). Plaintiff also provides: (1) a letter from his attorney to the Equal Employment Opportunity Commission ("EEOC"), which encloses a charge of discrimination dated March 9, 2017; and (2) a fax to Plaintiff's attorney, which encloses a "Notice of Appeal/Petition – Complainant" form completed by Plaintiff and dated September 21, 2017. (Docs. 43-2, 43-5).

If, on a Rule 12(b)(6) motion, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." Fed. R. Civ. P. 12(d). However, the Eleventh Circuit recognizes exceptions to this rule. For example, as Defendants recognize in their footnote, a court "may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim; and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). "A document is central to a complaint when it is a 'necessary part of [the plaintiff's effort] to make out a claim." *Madura v. Bank of Am., N.A.*, 767 F. App'x 868, 870 (11th Cir. 2019) (alteration in original) (quoting *Day*, 400 F.3d at 1276). "In this context, 'undisputed' means the authenticity of the document is not challenged." *Day*, 400 F.3d at 1276.

Additionally, a court may take judicial notice, at any stage of the proceeding, of an adjudicative fact not subject to reasonable dispute because: "(1) it is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources

whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), (d). As such, the Eleventh Circuit has held that a court may consider properly judicially-noticed documents in resolving a Rule 12(b)(6) motion. *See Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (holding that the district court "properly took judicial notice" of public records that "'were not subject to reasonable dispute' because they were 'capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned'"); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (holding that a court may take judicial notice of "relevant public documents" required to be filed, and actually filed, with the SEC in a securities fraud case "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents"); *see also Univ. Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) ("[P]ublic records are among the permissible facts that a district court may consider" without converting a motion to dismiss into a motion for summary judgment"). Finally, a court "may take judicial notice on its own." Fed. R. Evid. 201(c)(1).

Here, although Defendants offer a citation in an attempt to persuade the Court to consider the documents under the first exception noted above, the Motion to Dismiss is devoid of any accompanying argument. As such, Defendants' offered basis for consideration of the documents is unavailing. However, the Court may take judicial notice on its own, and it will take judicial notice of those exhibits that constitute part of the administrative record and are not subject to reasonable dispute. Thus, the Court takes judicial notice of the following records: (1) the April 5, 2016 complaint of employment discrimination; (2) the Department Notice of Rights and Responsibilities form; (3) the July 6, 2017 complaint of employment discrimination; (4) the June 16, 2017 letter on Department letterhead from Schafer; (5) the August 24, 2017 Notice of Final Agency Decision; (6) the administrate judge's order; and (7) the March 9, 2017 charge of

24

discrimination enclosed with the letter from Plaintiff's attorney. These exhibits constitute part of the administrative record and are not subject to reasonable dispute. The Court presently declines to take judicial notice of the AMSCOT fax coversheet, the e-mail from Schafer to Plaintiff's attorney, the cover letter from Plaintiff's attorney to the EEOC, and the fax to Plaintiff's attorney with the enclosed "Notice of Appeal/Petition – Complainant" form. Whether these documents are part of the administrative record, or whether they are undisputed, is unclear.[9]

## 2. Exhaustion and Untimeliness

The Court now turns to Defendants' argument that the Court should dismiss Plaintiff's retaliation claim under Rule 12(b)(6) because he "failed to exhaust his administrative remedies and/or failed to timely file a civil action as to his retaliation claims." (Doc. 40 at 2). "All personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Thus, "Title VII prohibits employers—including the federal government—from discriminating against employees on the basis of race or national origin." *Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1243 (11th Cir. 2012). However, before a federal employee may bring a Title VII action in federal court, he or she "must first seek relief from the agency where the alleged discrimination occurred." *Id.* "This requirement is not a technicality; [r]ather, it is part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel primary responsibility for maintaining nondiscrimination in employment." *Id.* (alteration in original) (internal quotation marks omitted). To that end, the EEOC "has adopted

---

[9] Although "Notice of Appeal/Petition – Complainant" form lists a date of service, the form is attached to a fax sent to Plaintiff's counsel. (Doc. 43-5). Whether the EEOC received this form is unclear, and the Court declines to assume that this document is part of the administrative record or otherwise undisputed.

regulations setting forth the procedure that employees must following in presenting discrimination claims to federal agencies." *Id.*

Under the regulations, "[i]t is the policy of the Government of the United States . . . to prohibit discrimination in employment because of race . . . and to promote the full realization of equal employment opportunity through a continuing affirmative program in each agency." 29 C.F.R. § 1614.101(a). Relevant here, "[n]o person shall be subject to retaliation for opposing any practice made unlawful by" Title VII "or for participating in any stage of administrative or judicial proceedings" under Title VII. *Id.* § 1614.101(b). "An aggrieved person must initiate contact with a Counselor with 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."[10] *Id.* § 1614.105(a)(1). The purpose of this consultation is to "try to informally resolve the matter." *Id.* § 1614.105(a).

When these informal attempts to resolve the matter are unsuccessful, the federal employee may file a formal complaint with the agency that allegedly discriminated against the complainant. *See* 29 C.F.R. §§ 1614.105(d), 1614.106(a). When an agency dismisses an entire complaint, the agency must issue a final decision, which constitutes final agency action. *Id.* § 1614.110(b). For those complaints that are not dismissed, an administrative judge must issue a decision on the complaint within one-hundred eighty days of the administrative judge's receipt of the complaint from the agency. *Id.* §1614.109(i). When the administrative judge has issued such a decision, the agency must then take final action on the complaint by issuing a final order within forty days of its receipt of the hearing file and administrative judge's decision. *Id.* § 1614.110(a). If the agency

---

[10] "Complaints alleging retaliation prohibited by [Title VII and other enumerated statutes] are considered to be complaints of discrimination for purposes of [Part 1614]." 29 C.F.R. § 1614.103.

fails to issue a final order within forty days of its receipt of the administrate judge's decision, the decision of the administrate judge becomes the agency's final action. *Id.*

A complainant may appeal to the EEOC an agency's dismissal of a complaint or final action. *Id.* §§ 1614.110(a), 1614.401(a). Title VII authorizes a complainant to file a civil action in an appropriate district court:

> (a)  Within 90 days of receipt of the agency final action on an individual or class complaint;
> (b)  After 180 days from the date of filing an individual or class complaint if final agency action has not been taken;
> (c)  Within 90 days of receipt of the Commission's final decision on appeal; or
> (d)  After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

*Id.* § 1614.407(a)–(d). *See also* 42 U.S.C. § 2000-e16(c).

In the context of federal employees' discrimination claims, the Eleventh Circuit has held that "'the purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer.'" *Brown v. Snow*, 440 F.3d 1259, 1263 (11th Cir. 2006). To determine if an employee failed to exhaust his or her administrative remedies, a court must examine whether "the complainant made a good faith effort to comply with the regulations and, particularly, to provide all the relevant specific information available to him or her." *Id.* (internal quotation marks omitted). Further, "a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004) (internal quotation marks omitted). "[J]udicial claims are allowed if they amplify, clarify, or more clearly focus the allegations" in the administrative complaint, but "allegations of new acts of discrimination are inappropriate." *Id.* at 1279–80 (internal quotation marks omitted). Nonetheless, courts are "extremely reluctant" to allow procedural technicalities to bar Title VII

claims, and "the scope of an EEOC complaint should not be strictly interpreted." *Id.* at 1280 (internal quotation marks omitted).

Here, Plaintiff alleges that he filed an administrative complaint "for race discrimination and retaliation in violation of Title VII" on April 5, 2016. (Doc. 39 ¶11). Plaintiff cites two case numbers and alleges that the "charge" in the second of these two cases "was denied on the basis that retaliation was properly subject to the original charge as a continuing action." *Id.* at ¶11 n.1. Plaintiff alleges that "[a]ll statutory requirements have been fulfilled, including any requirements for pre-suit administrative claims." (Doc. 39 ¶8). Plaintiff similarly alleges, albeit under a section of the complaint with a title pertaining to the Federal Tort Claims Act, that "[a]ll conditions precedent to the filing of this action has [sic] occurred, accrued, or have been waived as a matter of law." *Id.* at ¶10.

Plaintiff filed a complaint of employment discrimination with the Department on April 5, 2016. (Docs. 40-1 at 2; 43-1 at 1). The form prompted Plaintiff to provide information regarding the basis for his complaint, as well as his claims; Plaintiff omitted any information regarding the basis and attached a narrative for his summary of the claims, which generally recited the incidents of February 7, 2016, now alleged in the operative complaint, including Dr. Azneer raising his cane and Anglin restraining Plaintiff. (Docs. 40-1 at 2–5; 43-1 at 1–4 ). After retaining counsel, Plaintiff filed a charge of discrimination, dated March 9, 2017, with the EEOC, not the Department. *See* (Doc. 43 at 2; 43-2 at 2). The charge of discrimination alleged two instances of retaliation: (1) on December 13, 2016, Williams and Konstantinos sought to speak with Plaintiff regarding his first complaint for employment discrimination and Williams advised that it would be in Plaintiff's "best

interest" to speak with her;[11] and (2) on February 24, 2017, an FBI agent visited Plaintiff's residence and advised that she was investigating social media postings and the harassment of police officers of the Department. *Id.* (internal quotation marks omitted). Plaintiff admits that the filing of this charge with the EEOC was in error. (Doc. 43 at 2).

In her June 16, 2017 letter to Plaintiff's attorney, Schafer advised that she was closing the informal counseling for case number 2001-0516-2017102927, which was a different case than Plaintiff's first complaint of employment discrimination. (Docs. 40-2 at 4; 43-3 at 3). Schafer summarized the basis for Plaintiff's complaint as "Reprisal," with a reference to the case number for the first complaint for employment discrimination in parentheses. *Id.* She described the alleged reprisal as Williams and Konstantakos requesting to speak with Plaintiff regarding his discrimination complaint and Williams advising that it was in Plaintiff's "best interest" to speak with her. *Id.* (internal quotation marks omitted). Schafer advised that Plaintiff could either file a formal discrimination complaint within fifteen days from his receipt of her letter, or he could take no further action. (Doc. 40-2 at 5; 43-3 at 4).

Plaintiff filed a second complaint of employment discrimination on July 6, 2017. (Docs. 40-2 at 2; 43-3 at 1). Similar to Schafer's summary, Plaintiff listed "Reprisal" as the basis for his second complaint and referred to the claim number for the first complaint. *Id.* The second complaint listed two claims: on December 13, 2016, Williams and Konstantinos approached Plaintiff and "attempted to curtail or stop the investigation related to" Plaintiff's first complaint of employment discrimination; and (2) on February 24, 2017, the FBI "showed up unannounced to

---

[11] Oddly, the narrative for this claim refers to Plaintiff in the third-person in certain portions. Further, although this charge of discrimination and the second complaint of employment discrimination refer to Konstantakos as "Kristen Konstatine," the Court will refer to this individual as "Kristine Konstantakos" or "Konstantakos," given the allegations in the operative complaint.

harass [Plaintiff] and his family" regarding Plaintiff's first complaint of employment discrimination. *Id.* The second complaint of employment discrimination did not contain any additional allegations.

By letter dated August 24, 2017, the Department dismissed the second complaint of employment discrimination. (Doc. 40-3 at 2–3; 43-4 at 1–5). The Department noted that the second complaint of discrimination raised two claims: (A) whether Plaintiff was discriminated against on the basis of reprisal for prior EEO activity when Williams and Konstantakos attempted to coerce him into speaking with them about his first complaint of discrimination; and (B) whether Plaintiff was discriminated against on the basis of reprisal for prior EEO activity when an FBI agent arrived at his residence and harassed him regarding his first complaint of discrimination. (Doc. 40-3 at 2; 43-4 at 1). The Department dismissed the first claim because it constituted "the same matter that is currently before the Commission" and dismissed the second claim because the Department lacks jurisdiction over a matter regarding an employee of another federal agency. (Doc. 40-3 at 3; 43-4 at 2). Because the Department's decision constituted final agency action, an attached notice advised Plaintiff of his right to file a civil action in an appropriate district court: (1) "within 90 days of receipt of this final decision *if no appeal to EEOC has been filed*"; (2) if Plaintiff filed an appeal with the EEOC, within 90 days after receipt of the EEOC's final decision of his appeal; or (3) after 180 days from the date of Plaintiff's filing of an appeal with the EEOC, if the EEOC had not issued a final decision. (Docs. 140-3 at 4; 43-4 at 3) (emphasis added).

Finally, on April 2, 2019, the administrative judge granted summary judgment in favor of the Department on Plaintiff's first complaint of employment discrimination. (Doc. 40-4 at 2). Although the Department had previously dismissed Plaintiff's claim of retaliation regarding Williams and Konstantakos because that claim was already under consideration, the administrative

judge explained in a footnote that Plaintiff "did not identify reprisal as a basis or file any motions . . . to amend the complaint to include reprisal as a basis." *Id.* at 3 n.2.  The administrative judge's order advised Plaintiff that, within forty days, the Department was required to issue a final order notifying Plaintiff whether the Department would fully implement the decision. (Doc. 40-4 at 6–7). Plaintiff alleges that the Department issued a final decision on April 9, 2019, and that he filed the operative complaint within ninety days of that final decision. (Doc. 39 ¶¶12–13).

Defendants' attacks on Plaintiff's retaliation claims are quite limited. Defendants first argue that Plaintiff did not exhaust his administrative remedies because Plaintiff did not amend his first administrative complaint to include any retaliation claim. To the extent that this argument pertains to Plaintiff's allegations regarding Williams and Konstantakos and the FBI agent visiting his home, the argument is unavailing. After the Department dismissed Plaintiff's second administrative complaint, which included the allegations regarding Williams and Konstantakos and the FBI, Plaintiff had the option of appealing the dismissal to the EEOC. Plaintiff alleges that he has satisfied all administrative prerequisites for this action, and Defendants do not argue that Plaintiff declined, or failed, to appeal. Plaintiff alleges that he filed this lawsuit within ninety days of an April 9, 2019 final decision. No party provides this April 9, 2019 final decision to the Court. Further, although the administrative judge noted that Plaintiff's first complaint for employment discrimination was limited to discrimination, as Plaintiff had not identified retaliation as a basis or moved to amend the complaint to include retaliation, the Department had previously informed Plaintiff that his first claim for retaliation was *already being considered*. Defendants fail to explain why a complainant who was advised that one of his retaliation claims was already being considered should move to amend a prior complaint to include that claim. Relatedly, the governing analysis in determining administrative exhaustion is whether Plaintiff made a good faith effort to comply

with the regulations and provide the Department with relevant information available to him. Based on the allegations and the judicially noticed exhibits, the Court declines to find that Plaintiff failed to exhaust his administrative remedies for his retaliation claims regarding Williams and Konstantakos and the FBI agent visiting his home. With respect to the remaining retaliation allegations, the Court need not address this argument in light of its conclusion below.

Defendants also argue that Plaintiff failed to exhaust his administrative remedies for the retaliation claim to the extent that the claim rests upon his placement on administrative duties and his supervisor notifying him of a fact finding and questioning him regarding his harassment of Anglin in March of 2018 because he did not file administrative claims regarding either of these incidents. In the face of Defendants' challenge, Plaintiff does not point to his allegations or rely on his provided exhibits. Instead, Plaintiff merely claims, in passing, that he "properly preserved" the retaliation allegation regarding his supervisor "and continuing acts of reprisal" in his second complaint for employment discrimination. (Doc. 43 at 6–7.) But the judicially-noticed exhibits from the administrative record, provided by both Defendants *and* Plaintiff, do not indicate that Plaintiff raised these allegations in either his first administrative complaint or his second administrative complaint. Thus, Plaintiff provides no substantive argument that his placement on unidentified administrative duties at some unspecified time after his arrest, or that his supervisor's notification and questioning in March of 2018, were addressed below with the Department. Nor does he argue that these allegations were reasonably expected to grow out if his charge of discrimination. As such, Plaintiff has failed to exhaust his administrative remedies as to these specified allegations in relation to his retaliation claim.[12]

---

[12] The Court reaches the same conclusion for Plaintiff's claim that the Department "otherwise conspired to pressure the Complainant into not speaking out regarding the charge of discrimination," to the extent that Plaintiff's retaliation claim rests upon that allegation.

Finally, Defendants argue that, to the extent that Plaintiff's retaliation claim rests on the FBI's visit, the claim is untimely because Plaintiff failed to file a lawsuit within ninety days of the Department's final decision dismissing this claim. (Doc. 40 at 7). The Court can easily dispense with this attack. Defendants presume that ninety days is the applicable period to file a civil action. As explained above, Plaintiff had the option of appealing the Department's decision to the EEOC and filing a civil action *following* 180 days from the date of his filing of the appeal if there had been no final decision by the EEOC. While Plaintiff claims that he has satisfied all administrative prerequisites for this action, Defendants do not explain why this 90-day timeframe is applicable, nor do they argue that Plaintiff failed to appeal. In the absence of any argument addressing the correct timeframe, this argument fails.

Therefore, based on the foregoing, Plaintiff failed to exhaust his administrative remedies for his retaliation claim to the extent that he relies upon his allegations that he was placed on administrative duties following his arrest and his supervisor notified him of a fact finding and questioned his harassment of Anglin. Defendants' remaining arguments as to the retaliation claim are denied.

### ii. Assault Claim

As set forth above, the United States has been properly substituted for Dr. Azneer in the assault claim. Thus, Plaintiff brings an assault claim against the United States. However, the United States does not waive sovereign immunity for "any claim arising out of assault," except for any claim arising out of assault with regard to the acts or omissions of investigative or law enforcement officers. 28 U.S.C. § 2680(h). Therefore, the assault claim against the United States is due to dismissed, without prejudice, for lack of subject matter jurisdiction, as the United States has not waived sovereign immunity as to this type of claim. *Reed v. U.S. Postal Serv.*, 288 F. App'x

638, 639 (11th Cir. 2008). As such, the Motion to Dismiss is due to be granted as to the assault claim.

### IV. CONCLUSION

Accordingly, it is **ORDERED**:

1. Plaintiff's Renewed Challenge to the United States of America's Certification and Substitution for Dr. Azneer  (Doc. 45) is **DENIED**. The United States shall remain substituted for Dr. Azneer as to the assault claim in the operative complaint.

2. Defendants' Motion to Dismiss and Incorporated Memorandum of Law (Doc. 40) is **GRANTED-IN-PART and DENIED-IN-PART**.

3. Plaintiff's retaliation claim (Count III) is **DISMISSED, without prejudice,** for failure to exhaust administrative remedies **only to the extent that** the claim rests upon (a) his placement on administrative duties or (b) his supervisor notifying him of a fact finding and questioning him regarding his harassment of officer Christopher Anglin in March of 2018.

4. Plaintiff's assault claim (Count IV) is **DISMISSED, without prejudice,** for lack of subject matter jurisdiction.

5. The United States and Robert L. Wilkie shall answer the operative complaint within **FOURTEEN (14) DAYS** from the date of this Order.

**DONE AND ORDERED** in Tampa, Florida on November 20, 2020.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any